METTA ZELLMER, Administratrix, Appellant, v. WALKER D. HINES, Director General of Railroads, Appellee.

**RAILROADS:** Accidents at Crossings—Contributory Negligence. A traveler will not be declared guilty of negligence *per se* on a record which would justify a jury finding that he, with due and affirmative care, and because of the presence of intervening objects and of the entire absence of any warning signal by whistle or bell, approached, with an automobile in perfect repair, to within 26 feet of a railway crossing within a city, and was killed within less than two seconds thereafter by a train operated at the excessive rate of 66 feet per second.

*Appeal from Cass District Court.*—E. B. WOODRUFF, Judge.

MARCH 13, 1923.

REHEARING DENIED SEPTEMBER 22, 1923.

ACTION by administratrix of the estate of John E. Zellmer, deceased, to recover damages on account of the death of said decedent, and the destruction of an automobile belonging to him. Decedent was driving his automobile across the tracks of the Chicago, Rock Island & Pacific Railway Company, at the intersection of Linn Street, in the city of Atlantic, Iowa, with said tracks, and was struck by a train and instantly killed. At the close of plaintiff's testimony, the trial court directed a verdict for the defendant, on the ground that the evidence showed plaintiff's decedent to have been guilty of contributory negligence, as a matter of law. Plaintiff appeals from such ruling and order by the court.—*Reversed and remanded.*

*H. M. Boorman,* for appellant.

*W. A. Follett* and *J. G. Gamble,* for appellee.

ARTHUR, J.—I. Linn Street runs north and south, and the railway tracks extend east and west at the intersection. There were three tracks: the main track on which the passenger train in question was running was the south track, and the north track was the stockyards track. Between the main track and the stockyards track was a passing or switch track. From the middle of the main track to the middle of the passing track was 16 feet. From the middle of the passing track to the middle of the stockyards track was 19 feet. The tracks were 4 feet 8½ inches in width. About 8 or 10 feet south of the stockyards track and immediately east of Linn Street were located the railroad company's stockyards. The fence on the west side of the stockyards was 7 or 8 feet high, with a roof extending about 2 feet higher than the fence, thus obscuring the view to the east, of a traveler approaching the crossing from the north. Standing on the stockyards track were two box cars, the westerly one extending into Linn Street from 3 to 5 feet. The traveled part of the road in Linn Street was about 25 feet west of the stockyards. There were no gates, signals, or watchmen at the Linn Street crossing, and none had ever been maintained at such crossing; and this fact was known to plaintiff's decedent. Decedent had lived in the vicinity of Atlantic for a number of years, and was familiar with the Linn Street crossing where he was killed. De-

cedent had crossed over the Linn Street crossing within a short time prior to the time of the accident, and conditions had not changed from the time he passed over the crossing, about an hour before the accident. Decedent was driving a Ford car, and with him were two other men, Ed McNerney and one Connors, who were occupying the rear seat. Shortly before the accident, these three men had driven north over the Linn Street crossing to a field about 100 yards north of the crossing, to see a tractor demonstration, and were returning when the accident occurred. After leaving the scene of the tractor demonstration, decedent drove his car south on Linn Street. After moving opposite the stockyards, and during the time they were behind the stockyards and the cars standing on the stockyards track, the view to the east was obstructed by said stockyards fence and roof and cars, so that they could not see a train approaching from the east, until the automobile moved on south past the box cars standing on the north or stockyards track.

Up to this point, at the stockyards track, the testimony is that Zellmer was driving his car at a speed of 6 to 7 miles an hour; that all of the time he was passing along behind the obstructions he was looking and listening for trains; that, as the automobile in which the three men were riding, Zellmer driving, passed over the south rail of the stockyards tracks, which point was approximately 30 feet north of the north rail of the main line track, Zellmer, who was then looking toward the east, saw the train, which was then from 150 to 200 feet east of the crossing, moving from the east toward the crossing at a speed of from 40 to 50 miles an hour. The automobile had no curtains, and the view of the train was unobstructed. McNerney, who was riding in the rear seat of the automobile, on the west side, testified:

"I noticed Mr. Zellmer, as we were passing along the west side of the stockyards and west of the cars that stood just south of the stockyards, was looking and listening for trains that might be approaching, and just as soon as the car in which we were riding passed south of the car that was standing on the railroad track south of the stockyards, I looked to the east right of way, and I saw a train approaching the crossing, and I say that Mr. Zellmer observed the train approaching the crossing,

at the same time that I did, and checked the automobile some. I know that he applied the brakes and checked it. Mr. Zellmer did not stop the automobile in which we were riding before the front end of it reached the north rail of the main line track. When I first saw the train, it was about 150 to 200 feet from the crossing, running about 45 miles an hour. The automobile was running about 6 or 7 miles an hour. The engine struck the front end of the automobile. I was rendered unconscious. Just before the locomotive struck the front of the automobile, I saw him [Zellmer] make motions, that way, to stop it. When the automobile was 5 or 6 feet from the engine, I felt the auto jump ahead, and the smash came.''

The only other witness who testified to what Zellmer did after he had discovered the approach of the train was A. J. Weichert, who was standing 100 or 150 feet north of the tracks, where he could see the automobile moving toward the crossing and at the crossing, and saw the collision. He testified:

''Before the automobile came to the tracks it slackened its speed (it kind of stopped). This was just before it came on the main line; then it started up again. Everything was done in a flash, just like batting an eye.''

It may be noted at this point that the testimony establishes, for the purposes of this presentation of the case, that appellee was negligent in at least two particulars alleged by appellant: that no whistle was sounded for the crossing, and no bell was rung. And it may be said also, as alleged by appellant, that the train was being run at an excessive rate of speed, although the evidence does not disclose that there was any ordinance in the town of Atlantic limiting the speed of trains. Appellee does not contend that it was not negligent. It may also be observed that appellee concedes that Zellmer could not have discovered the approach of the train before reaching the point where he did discover it.

II. Thus we have this situation presented:

When the automobile entered the zone between the south rail of the stockyards tracks and the north rail of the main track, the train was moving toward the crossing at a speed of approximately 45 miles an hour, without sounding the crossing whistle or ringing the bell. Zellmer drove into the zone of the

tracks at a speed of 6 or 7 miles an hour. He was an experienced driver of his Ford automobile. The car was in good repair, with the brakes working properly. The roadway was practically level and dry. Zellmer could see and did see the train approaching, immediately upon passing the southwest corner of the box car. Then followed what Zellmer did, as testified to by Weichert and McNerney. McNerney testified to the speed of the train, and says that Zellmer was looking for a train, and saw it as soon as he came in view of it.

It is urged by counsel for appellant in argument that Zellmer, as he approached the crossing, was running at a moderate rate of speed, and that such claim finds support in the testimony that Zellmer was driving at a speed of only 6 or 7 miles an hour. It must be conceded, we think, that 6 or 7 miles an hour is a moderate rate of speed, and that a Ford automobile moving at such speed, driven by a man, familiar with the operation of it, with the car in good repair and the brakes working properly, could be stopped within a short distance.

Counsel for appellant bases his argument that Zellmer was not guilty of contributory negligence largely on the theory that Zellmer was ''lulled into security and apparent safety'' by the absence of warning signals, and ''is surprised by a train moving at 50 miles an hour.'' Counsel urges that Zellmer was not injured through his own negligence, because he was alert in approaching the crossing,—was listening for trains,—and, hearing no train signals, passed into the track zone, and was ''suddenly placed in an emergency and compelled to act instantly to avoid a collision;'' that Zellmer was ''not guilty of negligence in his attempt to escape, even though he blundered in his effort;'' and that, under such circumstances, Zellmer would not be held to strict exercise of ordinary care. Counsel says that ''the evidence shows that Zellmer was confused,'' and argues that, in such an emergency and consequent confusion, a driver, in attempting to reach the foot brake, would be liable to put his foot on the accelerator, and accomplish exactly the opposite of what he intended; and invokes the rule that, where one acts in an emergency under excitement and peril, the law does not require him under such circumstances to do, at his peril, the thing which afterwards appears to have been the safest, etc. The

rule sought to be invoked applies, of course, where the sudden emergency is created or caused by the negligence of the other party,—in the instant case, the appellee, the railroad company,—and not where the emergency is brought about by the negligence of the injured party himself. *Westcott v. Waterloo, C. F. & N. R. Co.,* 173 Iowa 355; *Ames v. Waterloo & C. F. R. T. Co.,* 120 Iowa 640.

But it is strenuously urged by appellant that decedent did not create the emergency in which it is claimed he found himself, by any negligence on his part. To exonerate decedent from negligence in entering the intersection, it is pointed out that he approached the zone of the tracks at a moderate speed, looking and listening for trains, and, hearing no warnings, was justified in crossing over the stockyards track; and that the emergency and consequent confusion arose from the approach of the train at the high and dangerous speed of 50 miles an hour, when decedent had a right to assume that, if he should be confronted by a train, it would not be running at an unreasonable, excessive, and dangerous speed. We will presently discuss this matter further.

Now, was Zellmer negligent, as a matter of law, in not stopping his car in time to avoid the accident? The excuse urged in argument for not stopping the car, and for speeding the car up when within a short distance of the main track, is that the driver became confused in the presence "of a sudden emergency." That the driver became confused is an inference drawn by counsel from the facts of what Zellmer did, and the surrounding facts and circumstances under which he acted. We are not privileged to know the mental operations of Zellmer. If the train were 200 feet away when Zellmer came within sight of it, then, when Zellmer was about in the middle of the space between the stockyards track and the passenger track, the train was approximately but 100 feet away from the crossing, because the train was traveling more than 6 times as fast as the automobile.

III. The verdict was directed, on motion of appellee, on the ground that plaintiff's decedent was guilty of contributory negligence, as a matter of law. The propositions relied upon by appellee to support the ruling of the court are that plaintiff's

decedent either (1) failed to have proper control of the automobile such as to enable him to stop, after he ascertained the presence of the train; or (2) attempted to cross ahead of the train. In either event, appellee insists that decedent was guilty of contributory negligence, as a matter of law.

Appellant relies, for reversal of the ruling of the court, upon the objections that the evidence does not show that decedent was guilty of contributory negligence as a matter of law; that the court erred in holding, as a matter of law, that decedent was guilty of contributory negligence; that decedent, under the facts and circumstances disclosed in evidence, was justified in assuming that appellee company would not neglect its duty to give the statutory signals or warnings of the approach of the train to the crossing; and that the question of decedent's contributory negligence, under the facts and circumstances shown in evidence, was not so clearly established that there was no room for difference of opinion thereon among fair-minded men, and should have been submitted to the jury.

As to the claim of appellee that decedent failed to have proper control of his automobile, such as to enable him to stop after he ascertained the presence of the train, we think we need not discuss this further than to say that, it being shown by the evidence that the car was driven at a speed of only 6 or 7 miles per hour, and that it was in perfect condition, with brakes properly working, and that the driver was experienced in the operation of his car, it cannot be said, as a matter of law, that decedent was guilty of negligence with respect to control of his car when he entered the intersection. If decedent were guilty of negligence which contributed to the accident, as a matter of law, we think such negligence occurred after he passed into the zone of tracks: that is, after he passed by the box car standing on the stockyards track, and came into unobstructed view of the train.

The question of contributory negligence in actions involving collisions between a train and an automobile on a railroad crossing has been frequently before the courts. The rules of law applicable to cases of this kind are well defined. The difficulty lies in applying the well established rules to the facts of any particular case. Ordinarily, the question as to whether or not a

party has been guilty of contributory negligence is a question of fact, to be determined by the jury. The simple definition of negligence is "want of ordinary care." The rule is that a party predicating his cause of action on the negligence of another party, to entitle himself to recovery, must prove himself free from negligence which has contributed to the injury complained of. It is obvious that the question as to whether or not a plaintiff has conducted himself as a man of ordinary care and prudence would have acted under the same or similar circumstances is a fact question, ordinarily and usually to be determined by the jury, under the evidence in any given case. But there are cases in which it is the duty of the court to direct the jury to return a verdict for a defendant, on the ground that the evidence shows that the plaintiff in the action has been guilty of contributory negligence or want of ordinary care. This situation arises when it appears that the plaintiff has failed to establish material facts essential to show the exercise of due care. In such instance, it is the duty of the court to direct a verdict for the defendant. The basic and fundamental reason for this is that, in such a situation, there is no question to submit to the jury in this regard, under the established rules of law. As before stated, we think it cannot be said, as a matter of law, that decedent was guilty of negligence in respect to control of his car up to the time he entered the track zone. Now, applying the rules above mentioned, was appellant guilty of negligence, as a matter of law, after entering the said area, in what he did or omitted to do, as disclosed by the evidence?

After passing over the stockyards track, there was the space between the south rail of the stockyards track and the north rail of the passenger track, of approximately 30 feet; and, allowing something for overhang of the box car and the passenger train, there would be approximately 26 feet within which to act. It is not our province to weigh the evidence and to reason from the facts and circumstances shown in evidence and arrive at a decision as to whether Zellmer was free from contributory negligence or was guilty of contributory negligence. The question presented to us for decision is whether the facts and circumstances shown in evidence warrant the conclusion, as a matter of law, that Zellmer was guilty of contributory negligence.

There was introduced the testimony for appellant only, and there is no dispute in the evidence,—some variance in the testimony of different witnesses, but no dispute on any material point. It has been many times said by the courts, in substance and effect, that, under all ordinary circumstances, negligence is a question for the jury. The exception to the rule is where the undisputed facts are such that all reasonable persons must draw the same conclusion from them. It is not enough that the judge presiding at the trial may believe that the plaintiff was guilty, or that, if serving as a juror in the case, he might properly find for the defendant upon the issue of contributory negligence. The trial judge cannot rightfully control or direct the verdict if other fair-minded, intelligent persons, considering the same evidence, may believe that the plaintiff's conduct was not inconsistent with the rule of reasonable care. Whether he failed to exercise ordinary care must be determined from what Zellmer did or failed to do, in the circumstances under which he acted. He approached the intersection—the zone occupied by the railroad tracks—at a speed of 6 or 7 miles an hour. While he was driving behind the barriers which obstructed his view to the east, he was looking and listening for warnings of trains that might be approaching the crossing from either direction. Nothing obstructed his view to the west. He could gain knowledge of a train approaching from the east only by his sense of hearing, which he was duly exercising, according to the testimony of McNerney. His hearing was good. He heard no warnings of the train approaching the crossing from the east, by whistle or bell. The testimony shows that there were none given. Zellmer was listening for warnings of the possible approach of a train. If the crossing whistle had been sounded, he doubtless would have heard it. If the bell had been rung, we may assume that he would have heard it. Now, if these statutory signals had been given, or either of them, Zellmer might have stopped short of and not have entered the zone of the railroad tracks at all until the train had passed, and the jury could so have found. Proceeding, as he did, across the stockyards track, and coming in view of the train, he saw it 150 to 200 feet away. McNerney testified that he observed the speed of the train, and that he could gauge its speed, and testified that it was running at 45 to

50 miles an hour.  Zellmer saw the train, and, we may assume, observed its speed.  But the record is silent as to whether or not he was able to estimate the speed of a train with any degree of accuracy.  Of course, after he came into the area of the railroad tracks and saw the train coming, sounding the crossing whistle or ringing the bell would have added nothing to his advantage.  But he may have failed to estimate the speed of the train.  It is difficult, we think, for persons inexperienced in gauging the speed of a train to estimate its speed with any degree of accuracy, and especially from a position almost in front of a train which is moving toward them.  A jury could find, under the evidence, that the train was running at a speed of 50 miles an hour, which, as a matter of law, may be said, we think, to be so excessive, within a town, as to constitute negligence.  If the train had been moving at somewhat less speed,—and Zellmer may have estimated the speed at considerably less than it was,—Zellmer might have passed over the track in safety.  The testimony is that the automobile was struck behind the back part of its engine.  If the train had been moving somewhat slower, and had been stayed an instant, the automobile would have passed over.

We are not able to agree with the learned trial court that the evidence establishes, as a matter of law, that appellant was guilty of contributory negligence.  We come to the conclusion that, under the facts and circumstances disclosed in this record, appellant made out a case upon which she was entitled to go to the jury.  This results in a reversal of the ruling and judgment of the trial court.—*Reversed and remanded.*

PRESTON, C. J., EVANS and FAVILLE, JJ., concur.